```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                    CASE NO. 21-20357-CRIMINAL-MOORE
 3

 4   UNITED STATES OF AMERICA,          Miami, Florida

 5                 Plaintiff,           July 6, 2021

 6         vs.

 7   JAYDEN DAROSA,

 8                 Defendant.           Pages 1 to 38

 9   _____

10               DETENTION HEARING CONDUCTED VIA ZOOM
               (TRANSCRIBED FROM THE AUDIO RECORDING)
11             BEFORE THE HONORABLE EDWIN G. TORRES,
                  UNITED STATES MAGISTRATE JUDGE
12

13
     APPEARANCES:
14

15   FOR THE GOVERNMENT:      ARIELLE KLEPACH, ESQ.
                              ASSISTANT UNITED STATES ATTORNEY
16                            99 Northeast Fourth Street
                              Miami, Florida 33132
17

18   FOR THE DEFENDANT:       HOWARD J. SCHUMACHER, ESQ.
                              LAW OFFICES OF HOWARD J. SCHUMACHER
19                            1 East Broward Boulevard
                              Suite 700
20                            Fort Lauderdale, Florida 33301

21
     TRANSCRIBED BY:          LISA EDWARDS, RDR, CRR
22                            Reporterlisaedwards@gmail.com
                              (305) 439-7168
23

24

25
```

```
 1              THE COURTROOM DEPUTY:   United States versus Jayden

 2     Darosa, Case No. 21-20357-Criminal-Judge Moore.

 3              Counsel, please state your appearances for the record.

 4              MS. KLEPACH:  Good morning, your Honor.  Arielle

 5     Klepach on behalf of the United States.

 6              MR. SCHUMACHER:  And good morning, your Honor.  May it

 7     please the Court:  Howard Schumacher on behalf of Mr. Darosa,

 8     who's participating by way of Zoom.

 9              THE COURT:  Good morning, everybody.

10              Mr. Darosa, you can hear me through the video system?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  Good morning.  We are set for a report re:

13     counsel and detention hearing and arraignment for Mr. Darosa.

14              Mr. Schumacher?

15              MR. SCHUMACHER:  May it please the Court, your Honor:

16     I had previously submitted a temporary notice of appearance.

17     I'm asking for an additional two weeks to make final

18     arrangements with Mr. Darosa's family.  So I'd be asking that

19     the arraignment be reset for the two weeks and a

20     determination-of-counsel hearing be set on an equal date, your

21     Honor.

22              THE COURT:  I'll set this matter, then, for two weeks

23     from today, which is --

24              THE COURTROOM DEPUTY:  July 20th, Judge.

25              THE COURT:  -- July 20th at 10:00 before the duty judge
```

```
 1    for the arraignment and report re: counsel.

 2              MR. SCHUMACHER:  Thank you, your Honor.

 3              THE COURT:  As to detention for Mr. Darosa?

 4              MR. SCHUMACHER:  Judge, we're ready to proceed.  I know

 5    that there's two Defendants in this case -- Co-Defendants in

 6    this case.  I don't know if the Court's going to be doing those

 7    together or separately.  But we're ready to go, your Honor.

 8              THE COURT:  I think we have to just do them separately.

 9              Is the Government ready to proceed?

10              MS. KLEPACH:  Yes, your Honor.

11              THE COURT:  Go ahead.

12              MS. KLEPACH:  The Defendant is charged among other

13    crimes with a violation of 18, United States Code,

14    Section 924(c), meaning that there's a presumption of detention

15    that arises in this case under 18 USC 3142(e)(3)(B).

16              The indictment stems from an incident that occurred on

17    October 9th of 2020, where the Defendants robbed two victims at

18    gunpoint, shooting them in the process.

19              The Co-Defendant, Defendant Williams, who also goes by

20    the pseudonym Poohshiesty, arranged to meet with Victim No. 1

21    to purchase marijuana from Victim No. 1 and extend the lease on

22    a green McLaren sports car.  Victim No. 1 had brokered the

23    rental for Defendant Williams.

24              Victim No. 1 brought Victim No. 2 with him to meet

25    Williams because Victim No. 2 was going to sell Williams a pair
```

1    of high-end sneakers and liquid codeine.

2           The victims met Williams and his two Co-Defendants,

3    Mr. Darosa and Bobby Brown, in Bay Harbor Islands.  The

4    shooting is captured on surveillance video which shows Williams

5    pulling up to the parking lot of the building in a green

6    McLaren with the Co-Defendant Bobby Brown, his road manager, in

7    the passenger seat.  When the Defendant pulled up in the

8    McLaren, Defendant Darosa pulled up next to him in a different

9    car, a black Mercedes Maybach.  The surveillance video then

10   shows the Defendants engaged in conversation with the victims.

11          A few minutes into the exchange, Victim No. 2 entered

12   the passenger's seat of the McLaren with a bag that contained a

13   bottle of liquid codeine inside.  While he was inside of the

14   passenger's seat, Victim No. 2 was holding the bag and one of

15   the sneakers that he had planned to sell to Defendant Williams,

16   the sneakers being valued at approximately $500.

17          Defendant Darosa and another unidentified male then

18   grabbed at Victim 2's jewelry in an attempt to steal it and

19   pointed firearms at him.

20          Moments later, Defendant Williams pointed his firearm,

21   a .762 assault rifle, at Victim No. 2 and demanded that he exit

22   the car.

23          As Victim No. 2 attempted to escape the vehicle,

24   Williams shot him in the buttocks.  Victim 2 then retreated

25   towards his vehicle and surveillance shows Defendant Bobby

1    Brown discharging his firearm and shooting Victim No. 1 in the

2    hip.

3          Victim No. 1 fell to the ground, at which point

4    Williams pointed the assault rifle at him and said to him,

5    "Don't even think about it."

6          The Defendants returned to their respective vehicles

7    and drove away.

8          As Williams was driving away, a bag fell out of the

9    driver's side door of the McLaren.  Law enforcement recovered

10   the bag and $40,000 in U.S. currency from it.

11         Among the currency was a $100 bill bearing a serial

12   number that ended in 478J.

13         The victims went to the hospital and received medical

14   treatment for their injuries.  And while they were at the

15   hospital, both of the victims identified the Defendants through

16   surveillance video and through social media.

17         Notably, one of the victims had a bullet lodged in his

18   leg until last week.

19         Law enforcement reviewed publicly available social

20   media posts as part of the investigation and observed several

21   photographs of Williams posing with wads of cash, one of which

22   was a photo that depicted Williams with the same $100 bill

23   ending in serial number 478J that was recovered from the scene

24   of the robbery.

25         Law enforcement also observed videos of Williams

1   driving the green McLaren and one video of him holding a bottle

2   of liquid codeine that was posted after the robbery.

3           There were also photographs of Darosa observed by law

4   enforcement depicting him holding a Draco firearm, which is

5   similar to the type of firearm that was used during the

6   robbery.

7           Notably, Mr. Darosa was also wearing a purple hooded

8   sweatshirt during the robbery, which was seen on the

9   surveillance, and law enforcement observed photographs of

10  Darosa wearing the same sweatshirt on his social media.

11  Mr. Darosa was also identified by the individual who rented him

12  the Mercedes Maybach in the days before the robbery.

13          The Defendants were all arrested on state charges

14  relating to this incident.  Defendant Darosa was held with no

15  bond but Defendant Williams was released on a bond.

16          Notably, Defendant Darosa had an open pending state

17  case involving the possession of a firearm at the time that he

18  was arrested in the instant case.

19          Lastly, Victim No. 2, the shoe salesman, operates a

20  business that uses the shipment, and therefore his goods travel

21  in interstate and foreign commerce.

22          That concludes the Government's factual proffer.

23          THE COURT:  Mr. Schumacher?

24          MR. SCHUMACHER:  Yes, Judge.  I'd like to cross-examine

25  an agent, if the Government has an agent available.

1          MS. KLEPACH:  Yes.  The Government has Task Force

2     Officer Elio García present on the Zoom.

3          THE COURTROOM DEPUTY:  Please raise your right hand.

4          ELIO GARCIA, GOVERNMENT WITNESS, SWORN.

5          THE COURTROOM DEPUTY:  Please state and spell your name

6     for the record, sir.

7          THE WITNESS:  My name is Task Force Officer Elio,

8     E-L-I-O, García, G-A-R-C-I-A.

9          THE COURTROOM DEPUTY:  Thank you.

10         MR. SCHUMACHER:  May I proceed, your Honor?  Your

11    Honor, may I proceed?

12         THE COURT:  Go ahead, Mr. Schumacher.

13         MR. SCHUMACHER:  Thank you.

14                        CROSS-EXAMINATION

15    BY MR. SCHUMACHER:

16    Q.  Officer García, have you reviewed video evidence in

17    connection with this case that was recovered from the scene of

18    the shooting?

19    A.  (No audible response.)

20    Q.  I'm sorry?

21    A.  Yes, sir, I have.

22    Q.  Is it fair to say that there's approximately six or seven

23    individuals that have arrived at the location in different

24    vehicles?

25    A.  Yes, sir.

1    Q.   Okay.  Now, from your affidavit, sir, I understand that

2    you've assigned the individual wearing a purple hoodie to be

3    Mr. Darosa.  Is that correct?

4    A.   That is correct, sir.

5    Q.   Okay.  And can we agree that -- have you reviewed any other

6    video evidence, for instance, at the hotel that they were first

7    seen at?

8    A.   No.  I have not reviewed that video.

9    Q.   Okay.  So the only video evidence that we have is what

10   was -- what occurred at the location in Bay Harbor.  Correct?

11   9700 East Bay Harbor Drive?

12   A.   That's the only video I have reviewed, sir.

13   Q.   Okay.  And can we agree, sir, that in that video, the

14   person that's in the purple hoodie has the hood up over his

15   head?  Correct?

16   A.   That is correct.

17   Q.   He also is wearing a mask at the time.  Correct?

18   A.   I don't know that.  I would have to review the video again.

19   But I'm not sure about the mask.

20   Q.   Okay.  Well, you've relied upon the victims to tell you or

21   to point you in the directions of who you think was wearing the

22   purple hoodie.  Isn't that fair to say?

23   A.   Well, we -- when I say "we," the Federal Bureau of

24   Investigation -- has adopted this case from the Bay Harbor

25   Islands police.  The Bay Harbor Islands police identified

1  Defendant Darosa as the person wearing the purple hoodie.

2  We've adopted their investigation as a federal case now.

3  Q.  What have you done individually that's allowed you to make

4  an identification of Jayden as the person wearing the purple

5  hoodie and driving the Maybach?

6  A.  Nothing, sir.

7  Q.  Okay.  So --

8  A.  We've -- I'm sorry.  Go ahead.

9  Q.  You've simply adopted Detective Castellano's information.

10  Correct?

11  A.  Correct.

12  Q.  So you've seen the video.  And can we agree that it's --

13  it's not perfect quality?  Would that be fair to say?

14  A.  It's not perfect; but it's better than -- it's better than

15  average.

16  Q.  Okay.  So my question is:  Are you or are you not able to

17  determine that the driver of the Maybach wearing the purple

18  hoodie is wearing a mask at the time of the commission of this

19  offense?

20  A.  Yes, you can.

21  Q.  You can tell that?

22  A.  But I don't remember if I saw a mask on him or not.  I

23  would have to review the video again, sir.

24  Q.  Okay.

25  A.  But at this point, as I'm testifying to you, I don't

1     remember seeing a mask on his face.

2     Q.   Okay.  Were you able to independently go back -- I'm

3     assuming that you looked at a database like DAVID to verify

4     whether or not you could identify anyone in connection with

5     this case?

6     A.   I did not do that, sir.

7     Q.   Okay.  So as we sit here today, you've done nothing in

8     terms of establishing that Jayden Darosa was the driver of the

9     Maybach and wearing the purple hoodie.  Is that fair?

10    A.   Independently, no, sir.  I --

11          MR. SCHUMACHER:  Judge, I'm going to ask for another

12    witness to be made available to me so I can conduct a

13    legitimate cross-examination.  While I appreciate Officer

14    García's candor, the Government has put somebody forward that

15    has absolutely no knowledge about identity in this case.  And I

16    think that that is a preeminent consideration by this Court

17    under the Bail Reform Act.

18          THE COURT:  Do you have any further questions for

19    Mr. García?

20          MR. SCHUMACHER:  Well, I do, Judge.  But is the Court

21    denying my request, then --

22          THE COURT:  Yes.

23          MR. SCHUMACHER:  -- that the Government make -- okay.

24          THE COURT:  The Government chooses to put on whatever

25    witnesses it does.  If it doesn't meet the burden, it's the

```
 1   Government's problem.

 2          MR. SCHUMACHER:  Understood, Judge.

 3   BY MR. SCHUMACHER:

 4   Q.  Officer García, have you looked at any of the social media

 5   in connection with this case that's been mentioned in the

 6   proffer?

 7   A.  Yes, sir, I have.

 8   Q.  Okay.  And what have you reviewed in terms of a social

 9   media that referred to a Dread or -- well, let's start with

10   Dread.  Did you find anything suggesting social media that

11   exists out there for an individual's screen name of Dread?

12   A.  I did not, sir.

13   Q.  What about anybody with the screen name of Montana Dread or

14   Dread Montana?

15   A.  I did not, sir.

16   Q.  Have you seen anything on your review of social media that

17   links my client, Mr. Darosa, with, for instance, Mr. Williams,

18   like for instance that they're friends or that they've even

19   posted photographs together before?

20   A.  Based on the report from Detective Castellano from the Bay

21   Harbor Islands police, they observed your client's social media

22   account where he was wearing the same clothes he used during

23   the date of the incident.

24   Q.  Okay.  I'm sorry.  Is that something -- can you -- is that

25   something that you mentioned in your criminal affidavit?
```

1    A.   The --

2    Q.   The fact that he was identified by the same article of

3    clothing or pieces of clothing?

4    A.   That is part of the affidavit, sir.

5    Q.   Okay.  Can you point that to me?  Because I don't remember

6    reading that in your -- did you do the probable cause in

7    connection with this case, the probable cause affidavit?

8    A.   I did.

9    Q.   And that was a document that was sworn to, I believe, on

10   June 3rd, 2021?

11   A.   Yes, sir.

12   Q.   Okay.

13   A.   Counsel, I don't have the complaint available with me.  I

14   do have Detective Castellano's report.

15   Q.   Okay.  Why don't we start with Detective Castellano's

16   report.  Can you point to me in Detective Castellano's report

17   that suggests that, upon review of social media, that there was

18   the same article of clothing or items of clothing that were

19   being worn by Jayden Darosa on social media as what was

20   apparently being worn by the driver of the Maybach that day?

21   A.   One second.

22        MS. KLEPACH:  Objection, your Honor.  Whether it's in

23   the report or not is, I would argue, not relevant to the issue

24   of detention.

25        THE COURT:  Overruled.

```
 1            THE WITNESS:  I'm sorry.  Overruled, your Honor?

 2            THE COURT:  Overruled.

 3            THE WITNESS:  Okay.  On Page 5 of Detective

 4   Castellano's report.

 5   BY MR. SCHUMACHER:

 6   Q.  Sorry.  I'm going to have to count them because I don't

 7   think they're numbered.

 8   A.  Okay.

 9   Q.  Go ahead.  I'm on Page 5.

10   A.  The first paragraph, I think in the middle of the

11   paragraph, where it starts with "Through open-source."

12   Q.  I'm sorry.  This is Page 5 of Detective Castellano's

13   report.  Is that right?

14   A.  That is correct, sir.

15   Q.  Okay.  And by the way, Page 5 is the last page?

16   A.  No, sir.  I have a nine-page report.  Yes.  I have nine

17   pages.

18   Q.  Okay.  I'm looking at an affidavit in support of a warrant.

19   Are you looking at something else?

20   A.  Yes.  I'm looking at Detective Castellano's report as a Bay

21   Harbor Islands Police Department report that was filed by

22   Detective Castellano.

23   Q.  Okay.  Go ahead, sir.

24   A.  Like I said, in the first paragraph of the page, middle of

25   the paragraph, it states -- can I read?
```

1    Q.   Go ahead, sir.

2    A.   "Through open-source social media investigation, an

3    Instagram handle by the name of Dread Montana was located and

4    numerous images were inside the profile.

5         "The images were shown to Mr. Cooper, who immediately

6    identified the person under the Instagram handle Dread Montana

7    as the male on the scene wearing the purple clothing that got

8    out of the driver's side of the black Maybach.  The person

9    behind the Instagram handle of Dread Montana was identified as

10   Mr. Jayden Saquen Darosa.

11        "The same image was shown to Mr. Serna, Victim No. 1" -- a

12   correction -- "and he also identified Mr. Darosa as being on

13   the scene on the driver's side of the black Maybach."

14   Q.   Okay.  And that's what you're relying on.  Correct?

15   A.   That is correct, sir.

16   Q.   Can we agree that that's something different than what you

17   had just testified to, Detective -- or Officer?  Excuse me.

18   Didn't you say on cross-examination that Mr. Darosa was seen on

19   social media wearing the exact same purple hoodie?  That's not

20   what that report says.  Can we agree to that?

21   A.   I think that's what I just testified to, sir.

22   Q.   I know.  What do you base that on?  You are basing that on

23   Detective Castellano's report.  Correct?

24   A.   Yes, sir.

25   Q.   Okay.  Is there anywhere in that report that you just read

1   to us that says that Jayden was seen wearing the exact same

2   purple hoodie on social media at a different time other than

3   the video?

4   A.   Okay.  Should I read this again?  Because I don't --

5   Q.   No.  I'm asking you a question, sir.  Does that refresh

6   your recollection?  You've had an opportunity to now read it

7   both to yourself --

8   A.   I answered the question that you are asking me.  It says on

9   this report that he was seen wearing the purple hoodie and that

10  he was seen on social media wearing the purple hoodie that he

11  had on the date of the incident.

12  Q.   Okay.  I'll move on.

13        Was there any social media that ever linked my client with

14  Mr. Williams?

15  A.   There was.  There were social media posts that were -- the

16  Defendant was tagged, for lack of a better word, that link with

17  Co-Defendant Williams.

18  Q.   Okay.  And does that mean that they knew one another?

19  A.   If they're tagging each other, Counselor, I -- it's safe to

20  assume that, yes, they knew one another.

21  Q.   Do you know who was tagging whom?

22  A.   I do not.

23        MS. KLEPACH:  Objection.  Relevance.

24  BY MR. SCHUMACHER:

25  Q.   Do you know over what time period this occurred, sir?

1   A.   (No audible response.)

2   Q.   Officer?  Officer García?  Do you know over what time

3   period this tagging originally occurred?

4   A.   I think the Government objected.

5   Q.   I understand.

6        THE COURT:  I missed that.  I'm sorry.  What was the

7   objection?

8        MS. KLEPACH:  The objection was to the previous

9   question as to who tagged who.  I would object as to relevance.

10       THE COURT:  Overruled.

11       Go ahead, Officer García.

12       THE WITNESS:  No.  I do not know who tagged who.

13  BY MR. SCHUMACHER:

14  Q.   Okay.  What about between Mr. Darosa and Mr. Brown?  Was

15  there any correlation between social medias between the two of

16  them?

17  A.   I don't know that, sir.

18  Q.   Are either of these individuals friends with Mr. Darosa?

19  Are they friends on Instagram or on Facebook or any other

20  social media?

21  A.   I would submit to you, sir, that they know each other.  I

22  don't know if they're friends or not.  They did arrive

23  together.  They did leave together.  They arrived to be on a

24  video shoot for a song for Co-Defendant Williams.

25       So I don't know if they're friends or not.  But they do

```
 1   have knowledge of each other and know each other.

 2   Q.  Okay.  Well, let's be clear here, Officer.  They didn't

 3   arrive together in the same vehicle.  Correct?

 4   A.  They did not.  They did not.  They arrived --

 5   Q.  I'm --

 6   A.  -- at the same time in different vehicles.

 7   Q.  Okay.  So Mr. Williams and Mr. Brown are in the lime-green

 8   McLaren.  Correct?

 9   A.  Correct.

10   Q.  The person that you and the Government have ascribed is

11   Mr. Darosa is in the driver's side of a Maybach that pulls up

12   close to it.  Correct?

13   A.  Correct.

14   Q.  Okay.  And by the way, in this video, the point of view of

15   this video is from a motion-activated camera on the driver's

16   side of the McLaren.  Correct?

17   A.  Correct.

18   Q.  Okay.  And is it fair to say that you don't see what

19   happens between -- on the passenger's side of that vehicle?

20   A.  No.  You do see it.

21   Q.  What do you see?  You see somebody getting out, back out of

22   the passenger's side, running away from the car.  Correct?

23   A.  No.  Prior to that, you do see the Defendant getting out of

24   the driver's side of the Maybach, an unknown Co-Defendant

25   getting out of the left rear passenger's side of the Maybach,
```

1   armed with what appears to me based on my experience as an AR

2   pistol.

3       And when they approached the passenger's side of the green

4   McLaren, you do see a struggle.  Then you do see those two same

5   individuals that exited the Maybach back out away from the

6   McLaren; and the rear passenger of the Maybach, the one that

7   exited armed with the AR pistol, grabs the same bag that Victim

8   No. 2, the passenger in the McLaren, had in his possession, and

9   he throws it in the backseat of the Maybach.  That is seen on

10  video.

11  Q.  And who does that, sir?

12  A.  The rear passenger of the Maybach.  The unknown

13  Co-Defendant.

14  Q.  Okay.  So how many people are actually in the Maybach?

15  A.  I would submit to you that I observed three people exiting

16  the Maybach.

17  Q.  Okay.  Is it your testimony --

18      THE COURT:  Officer Garcia, at any point, can you

19  actually -- maybe not during that initial point in time, but at

20  some point does the video from the Maybach show the Defendant's

21  face enough to recognize him?

22      THE WITNESS:  As you zoom -- the video's able to zoom

23  in.  However, the more that you zoom in, it starts to get

24  pixilated.

25      Because I know who the Defendant is now, I can make an

1    educated guess as to the person in the video and the person in

2    front of me that is presented as the Defendant.  And it is --

3    it is similar.  They do look the same, because I know who the

4    Defendant is.  However, if I did not know who the Defendant

5    was, I don't think I would be able to say Yes, that's him.

6              THE COURT:  So looking at the video, a person who

7    doesn't know anybody would say they're similar, but you

8    couldn't make a positive identification from that video alone?

9              THE WITNESS:  That's correct, your Honor.  However, the

10   victims did have prior encounters with the Defendants in this

11   case on the days leading up to the incident.  So based on those

12   prior encounters, that information was provided to the Bay

13   Harbor Islands Police Department and they were able to advance

14   their investigation based on the information provided.

15             THE COURT:  Back to you, Mr. Schumacher.

16             MR. SCHUMACHER:  Thank you, Judge.

17   BY MR. SCHUMACHER:

18   Q.  Officer García, did you actually go and speak with any of

19   the victims?  Let's start with when they were receiving medical

20   treatment.

21   A.  I did not.

22   Q.  Okay.  So that would have been the same day of the

23   shooting, correct, that they were receiving medical care?

24   A.  I did not.

25   Q.  Did you or any of your colleagues -- did you review any

```
1    type of property receipts that would have been prepared based

2    upon their contact with them on that day?

3    A.   I'm sorry.  Say that again.  Property receipt based on

4    contact?

5    Q.   Yeah.  In other words --

6              MS. KLEPACH:  Objection, your Honor.  Relevance.

7              MR. SCHUMACHER:  I'm sorry, Judge.  If I could just

8    finish my question first, and then the Government if it deems

9    it to be appropriate can raise --

10             THE COURT:  Restate your question.

11   BY MR. SCHUMACHER:

12   Q.   Officer García, did you ever review any property receipts

13   that were taken from that day for the victims that had actually

14   gone out and sought medical treatment?

15             MS. KLEPACH:  Objection as to relevance.

16             THE COURT:  What's --

17             MR. SCHUMACHER:  Judge, this is claimed to be a Hobbs

18   Act.

19             THE COURT:  What's the relevance of that?

20             MR. SCHUMACHER:  I'm sorry, Judge.  I don't mean to

21   speak over the Court.

22        This is deemed to be a Hobbs Act robbery and an

23   attempted 924(c) use.  I think it would be relevant in terms of

24   what -- we know that there was a bag of cash that was found at

25   the scene.  I would like to know if there was any kind of
```

1    evidence or indicia that these individuals were subjected to

2    any type of grab of anything of value, whether it was jewelry

3    or money.  We know from the proffer that there was an

4    allegation made that the person in the purple hoodie had

5    actually made an attempt to take jewelry off of the individual

6    that was seated in the McLaren.

7         I want to know if any of that jewelry was missing or if

8    they still had it or if they had large amounts of cash or

9    anything else.

10        THE COURT:  Okay.  Overruled.

11        Do you understand the question, Officer García?

12        THE WITNESS:  I do, your Honor.

13        THE COURT:  Go ahead.

14        THE WITNESS:  The property receipts that were filled

15   out by the Bay Harbor Islands police officer were for items

16   that were seized at the time.  I don't believe that the

17   victim's jewelry was seized; therefore, a property receipt

18   would not have been written.

19        I know that they wrote property receipts for the bag

20   that was found at the scene of the incident.  They wrote

21   property receipts for the one casing that was found at the

22   scene of the incident.  But --

23   BY MR. SCHUMACHER:

24   Q.  Officer, I'm going to stop you, because that's not

25   responsive to my question.

1    I'm asking specifically:  What was enumerated as having

2   been taken off the victims at the hospital by law enforcement?

3   A.  Taken by law enforcement?  Nothing, counsel.

4   Q.  Taken and seized as evidence.

5   A.  Nothing.

6   Q.  Was anything memorialized?  Did they have cash on their

7   person?

8   A.  Nothing was taken from the victims.

9   Q.  Nothing was taken from the victims?

10  A.  By law enforcement, Counselor.  By law enforcement, nothing

11  was taken from the victims.

12  Q.  Okay.  All right.  So did they even look to see what the

13  people had --

14  A.  Counselor, I --

15  Q.  -- Victim 1 and 2?

16  A.  I adopted this case in June of 2021.  This incident

17  occurred in October of 2020.  I don't know -- I can only go by

18  what Detective Castellano wrote on his report.  I don't know if

19  they looked, because I was not there.  So I can't answer that

20  question for you, sir.

21  Q.  Okay.  Are you aware of any discrepancies between your

22  report and Detective Castellano's as it relates to how this

23  robbery occurred?

24  A.  I am not aware of any, sir.

25  Q.  Okay.  Well, were you aware that in his report, the

1   allegation was that Victims 1 and 2 were delivering marijuana

2   to Mr. Williams?

3   A.   Yes.  I am aware of that.

4   Q.   Okay.  And then somewhere between then and now, now that's

5   become codeine.  Is that correct?

6   A.   Well, let me explain that.  Victim No. 1 was delivering

7   marijuana.  Victim No. 2 was delivering liquid codeine and

8   high-end athletic shoes.  All three items were taken from the

9   victims by the Defendants.  So I don't know how you're

10  confusing that.  The marijuana --

11  Q.   I'm not confused at all, sir.

12       My question is:  Mr. -- there was a bag that was found with

13  $40,000.  How much of that was turned over to Victims 1 and 2?

14  A.   None of that.  That bag fell out of the --

15  Q.   And you have -- I'm sorry.  You have the --

16       THE COURT:  Mr. Schumacher, Mr. Schumacher, if you're

17  going to ask him a question, you're going to have to wait for

18  his answer.

19       MR. SCHUMACHER:  I understand.

20       THE COURT:  If you don't want his answer, don't ask him

21  a question.

22       MR. SCHUMACHER:  Yes, your Honor.

23  BY MR. SCHUMACHER:

24  Q.   So do you understand my question?

25  A.   Yes.  That bag with the money that fell out of the McLaren

 1    was -- on video, you can clearly see Defendant Williams taking

 2    his leg out of the McLaren and kicking that bag partially out.

 3         When he points his weapon at Victim No. 2, who's on the

 4    ground between the McLaren and the victim's vehicle, that bag

 5    comes out of the McLaren.  When he leaves, that bag gets caught

 6    underneath the tire of the McLaren and gets spit out back.  So

 7    that money was not handed to any of the victims; that money was

 8    accidently kicked out by Defendant Williams.

 9    Q.   How much was the agreement to purchase the shoes?  How much

10    was going to be paid for the shoes?

11         MS. KLEPACH:  Objection as to relevance.

12         MR. SCHUMACHER:  It's very relevant, Judge.

13         THE COURT:  Ordinarily --

14         MR. SCHUMACHER:  There's a claim that -- by the officer

15    that none of the money -- I'm sorry, Judge.  I don't mean to

16    talk over you.

17         THE COURT:  Ordinarily, it wouldn't be relevant.  But

18    since there is a Hobbs Act claim, the economic component of

19    this is an element of the case.  So if you didn't charge him

20    with a Hobbs Act robbery, and it was just strictly use of a

21    weapon, or conspiracy to use a weapon, then it would be

22    irrelevant.  But technically, it's at least tangentially

23    relevant.

24         So overruled.

25

BY MR. SCHUMACHER:

Q.   How much was the agreement between Mr. Williams and either
of these victims to pay for the shoes?

A.   Based on my conversation with the victim, the one that was
selling the shoes, the shoes were worth $500 at the time of the
incident.

Q.   Okay.  And then whether it was marijuana or if it was
codeine, how much was the marijuana and/or the codeine -- how
much was going to be paid for that?

A.   (No audible response.)

Q.   I'm sorry.  Did you cut out on me, Officer García?  I
didn't hear a response.

A.   No.  I believe the Government objected.  I think she
objected.

                THE COURT:  Oh.

                MS. KLEPACH:  I didn't.

                THE COURT:  I didn't hear it.

                THE WITNESS:  Okay.  I'm sorry.

                No.  For the marijuana, I don't know what the price was
for the marijuana and the liquid codeine.  I'm not a narcotics
detective.  I don't know what the going price or going rate for
that is.  And I don't have an agreed-on price for those items.

BY MR. SCHUMACHER:

Q.   Okay.  Well, what we do know is that $40,912 in U.S.
currency was recovered from the Louis Vuitton bag.  Correct?

1    A.   That is correct.

2    Q.   Kind of an odd number.  Right?  It's not an even number,

3    certainly.  Right?

4    A.   It's not.

5    Q.   Okay.  Is it fair to say that whatever is occurring inside

6    the vehicle between the victim and Mr. Williams is not directly

7    visible by the camera view?

8    A.   Not -- that's fair to say.

9    Q.   In fact, if there was a hand-to-hand, you never saw it.  Is

10   that fair?  And you've reviewed the video.

11   A.   Well, the hand-to-hand is seen for the marijuana, but

12   not -- you can see the shoes passing back and forth between

13   Victim No. 2, Defendant Williams and then the shoe actually

14   goes into the Maybach for Defendant Darosa to inspect.  So you

15   do see that on the video.

16   Q.   Okay.  So you don't see any money --

17          THE COURT:  Last question, Mr. Schumacher.

18          MR. SCHUMACHER:  Yes.

19   BY MR. SCHUMACHER:

20   Q.   You don't see any money changing hands.  Correct?

21   A.   I do not see that.  And based on my conversation with the

22   victims, no money exchanged hands.

23   Q.   And you're relying upon them to relate that to you.

24   Correct?

25   A.   Correct.

1   Q.   Were either victim armed?

2   A.   No, sir.

3   Q.   That's what they told you?

4        THE COURT:  I missed the question.

5        MS. KLEPACH:  Objection.

6        THE COURT:  I missed the question.

7        MR. SCHUMACHER:  Were either of victims armed with a

8   firearm?

9        THE COURT:  Oh, I see.

10       What was the answer, Mr. García, Officer García?

11       THE WITNESS:  No, your Honor, they were not.

12  BY MR. SCHUMACHER:

13  Q.   Again, that's something that you're relating what they

14  informed you about.  Correct?

15  A.   That and the fact that the Bay Harbor Police Department

16  checked the vehicle and they found no indicia of any firearms

17  or any kind of ammunition inside of their vehicle.

18       MR. SCHUMACHER:  Judge, I don't have anything

19  additional.

20       THE COURT:  Any questions, Ms. Klepach?

21       MS. KLEPACH:  Yes, your Honor.  Just briefly.

22                       REDIRECT EXAMINATION

23  BY MS. KLEPACH:

24  Q.   Detective García, I believe you've said this already.  But

25  you've spoken to the victims in this case.  Correct?

```
1    A.   I have.

2    Q.   And you've spoken to them multiple times?

3    A.   I have.

4    Q.   Specifically, was one of the things that you spoke to them

5    about their prior relationship with the Defendants?

6    A.   Yes.

7    Q.   And did the victims explain to you that they had a prior

8    relationship with the Defendants?

9    A.   Yes.

10         MR. SCHUMACHER:   I'm going to object to relevance

11   unless it has to do with this particular Defendant.

12         THE COURT:   Overruled.

13         THE WITNESS:   Yes.   That's correct.

14   BY MS. KLEPACH:

15   Q.   Specifically, did the victims meet with the Defendants

16   multiple times -- actually, let me rephrase that.

17         With respect to Defendant Darosa, had both of the victims

18   met him before?

19   A.   They met him the day prior.

20   Q.   Okay.   And specifically with respect to Defendants Williams

21   and Brown, did both victims meet those Defendants in the days

22   leading up to the robbery?

23   A.   Yes.

24   Q.   With respect to the social media account that was

25   associated with -- or that is associated with Defendant Darosa,
```

```
 1   was that social media account given to law enforcement by one
 2   of the victims?
 3   A.   Yes, it was.
 4   Q.   And did the victim explain to law enforcement that he knew
 5   Defendant Darosa as Dread Montana?
 6            MR. SCHUMACHER:  Objection.  Objection to leading.
 7            THE COURT:  Overruled.
 8            THE WITNESS:  That is correct.
 9   BY MS. KLEPACH:
10   Q.   Okay.  I want to talk a little bit about -- I believe you
11   did mention this on cross-examination.  But I wanted to
12   clarify.  Which items -- what items were taken from the
13   victims?
14   A.   14 grams of marijuana, a bottle with liquid codeine, and a
15   pair of athletic shoes valued at $500.
16   Q.   Were the victims ever paid for that -- for those items?
17   A.   They were not.
18   Q.   Does the video surveillance show the victims leaving the
19   scene of the robbery?
20   A.   It does.
21   Q.   And does the video surveillance show the victims at any
22   point touching or even -- touching or interacting with at all
23   the bag that contained $40,000 in cash?
24   A.   It does not.  They never touched it.  They left and left
25   the bag behind.
```

1  Q.   So from the time that the Defendants left the scene in

2  their respective vehicles to the time that the victims left in

3  their vehicle, can you explain what it is that happens in that

4  intervening time period?

5  A.   Sure.  When Defendant Williams kicks the bag out of the

6  McLaren, he points his weapon at one of the victims who is

7  lying on the ground in between the green McLaren and the

8  victim's vehicle.

9       Then the Defendant Williams closes the door to the green

10 McLaren.  All the other Co-Defendants are inside of the black

11 Mercedes Maybach.  One of the passengers of the Maybach closes

12 the passenger door on the McLaren and both vehicles flee.

13      As the McLaren is leaving, the rear tire drives over the

14 bag and spits the bag backwards.  I then see one of the victims

15 pick up his friend, who is shot in the hip, place him in the

16 victim's vehicle and then the victim's vehicle leaves.  And we

17 know now that they went to seek medical attention.

18      From the time that the victims' vehicle leaves, the camera

19 is pointed at the location where the incident occurred and the

20 bag is left in full view of the camera.  Nobody disturbed the

21 bag and the bag was still in its location when law enforcement

22 arrived at the scene of the incident.

23 Q.   Do you know whether the bag was closed at the time law

24 enforcement recovered it?

25 A.   It was.

```
 1              MS. KLEPACH:  I have nothing further.

 2              THE COURT:  Thank you, Officer García.

 3              THE WITNESS:  Thank you, your Honor.

 4              (Witness excused.)

 5              THE COURT:  Any additional evidence from the

 6    Government?

 7              MS. KLEPACH:  Just argument.

 8              THE COURT:  Any evidence from your side of things,

 9    Mr. Schumacher?

10              MR. SCHUMACHER:  If I could proceed by way of proffer,

11    your Honor.

12              THE COURT:  Go ahead.

13              MR. SCHUMACHER:  Thank you, Judge.  May it please the

14    Court:

15              Judge, I'll make note of the fact of a couple of

16    things.  First of all, the evidence in this case is I would say

17    relatively weak against Mr. Darosa, your Honor.  We've got a

18    complete failure on the part of the Government to put forward

19    meaningful evidence providing a clear identification of

20    Mr. Darosa.

21              In fact --

22              THE COURT:  Why doesn't the victims' testimony coupled

23    with the similarity of the Defendant in the video constitute

24    sufficient evidence?

25              MR. SCHUMACHER:  So for one thing, your Honor --
```

| | |
|---|---|
| 1 | THE COURT:  Why isn't that enough? |
| 2 | MR. SCHUMACHER:  For one thing, Judge, I've also looked |
| 3 | at the video; and I can tell you that the video suggests to me |
| 4 | that the person is wearing a mask.  The person that's |
| 5 | identified as Mr. Darosa who's driving the Maybach is wearing a |
| 6 | purple hoodie.  It's pulled way over his head.  There appears |
| 7 | to be a mask of some sort over him. |
| 8 | According to the proffer, the Government says that one |
| 9 | or more of these victims met Mr. Darosa the day before this |
| 10 | occurred. |
| 11 | And again, we have no testimony, direct or otherwise, |
| 12 | that suggests that they saw him with or without a mask or under |
| 13 | what circumstances that first occurrence happened. |
| 14 | What they do, Judge, is somehow or another they're able |
| 15 | to identify a screen name of either Dread Montana or Dread.  I |
| 16 | think the proffer is Dread Montana.  And then law enforcement |
| 17 | goes, and not even this agent, but the Detective Castellano |
| 18 | from Bay Harbor, and he goes out and he actually looks at the |
| 19 | Instagram account and says:  Oh, this person's completely |
| 20 | consistent with what appears to be -- again, Judge, for that |
| 21 | particular individual, I would say that even making an |
| 22 | assessment that he's African-American is somewhat suspect, your |
| 23 | Honor, based upon what little that you can see at that point in |
| 24 | time. |
| 25 | So I think identity is particularly suspect, because in |

1    this case the task force officer was pretty honest, Judge.  He

2    says:  Listen, if I didn't know who it was -- and how does he

3    know who it is?  Because the detective from Bay Harbor has made

4    an assessment after having been provided a screen name that

5    this person is one and the same as the driver of the vehicle at

6    that point in time.

7          There's no corroborative evidence of that, Judge.  They

8    had met -- this is in the criminal complaint in the

9    affidavit -- they had met at a hotel prior in time to actually

10   proceed into the location where the shooting occurs.  There's

11   no video.  There's no other testimony from anybody that says

12   that they -- that were able to actually say, Oh, this person

13   doesn't have -- he's not wearing a mask; he's not wearing a

14   hoodie.  We can identify this person.

15         So you've got two witnesses that were under extreme

16   duress because they both had been shot.  Presumably, they're in

17   pain.  They're probably being treated with some type of

18   analgesics or opioids for treatment of the pain and for

19   remediation at the facility.

20         And they're providing testimony about a person that

21   they met apparently one time the day before under circumstances

22   which there's no detail before this Court, your Honor.

23         So they're under the influence of some type of

24   controlled substances, presumably, since they're being treated.

25   I would imagine that's very painful, to either be shot in the

1     hip with a bullet lodged in the leg or be shot in the buttocks.

2          THE COURT:  And the problem is, though, the officer

3     interviewed them well after they were treated.

4          MR. SCHUMACHER:  I'll just -- I've reviewed both the

5     criminal -- excuse me -- an affidavit in support of a search

6     warrant in the state court case.  And they were interviewed on

7     two separate occasions:  one, the date of the shooting when

8     they were being treated, and then a short time thereafter.  And

9     I think it was actually two days later when Detective

10    Castellano goes out and speaks to them.

11         And again --

12         THE COURT:  Officer García said -- testified that he

13    spoke to them separately.

14         MR. SCHUMACHER:  Correct.  After the fact, Judge.

15    After information had already been related to them and

16    presumably they were provided with some type of showup or

17    something along those lines and they said:  Yeah.  That's the

18    person.

19         I mean, this is an investigation that Officer García

20    himself has said:  Okay.  Some of this is occurring eight

21    months ago.  And as he's speaking to them, I think he said he

22    took over a relatively short time period ago, your Honor.

23         So what was related to those witnesses and what was

24    shown to them and what taint, if anything, that has, I think

25    that that's something that the Court should consider in terms

```
 1    of overall identification.

 2          THE COURT:  Remember, the burden for me is not beyond a

 3    reasonable doubt.  You may be right that it may not be able to

 4    prove that beyond a reasonable doubt.  But the burden for me is

 5    really more of a clear and convincing standard.

 6          MR. SCHUMACHER:  Understood.

 7          THE COURT:  Here, you have the victims' testimony, the

 8    similarity on the video and the identification of social media

 9    that corresponds to him.  If you put the three things together,

10    some of that is circumstantial, I grant you.  But --

11          MR. SCHUMACHER:  Yes, sir.

12          THE COURT:  -- for purposes of detention, isn't clear

13    and convincing enough?  And then assume you say for the sake of

14    argument that that's true.  Wasn't he out on bond at the time

15    this alleged offense was committed?

16          MR. SCHUMACHER:  He was out on bond, Judge.  That is

17    accurate.

18          I will point out, your Honor, that --

19          THE COURT:  And he's out on bond on a carrying a

20    concealed weapon and a --

21          MR. SCHUMACHER:  Yes, Judge.  That was actually a

22    diversionary case.  And but for COVID and the delays associated

23    with COVID, that would have already been dismissed, your Honor.

24          THE COURT:  Right.

25          MR. SCHUMACHER:  I recognize that there was the
```

1  intervening case up in Broward County, the burglary, your

2  Honor.

3        But we believe, Judge, that there are conditions or a

4  combination of conditions, including but not limited to, home

5  arrest.  His mother has property located -- this is her primary

6  residence.  This would be Kawika Suggs, your Honor, at 6563

7  Northwest 1st Court in Margate, Florida 33063.  She's the

8  individual owner of that property and appears solely on the

9  deed.

10        That property's worth approximately $345,000.  She has

11  about a $265,000 first mortgage and she also has -- and so what

12  we would propose, Judge, is a $100,000 personal surety cosigned

13  by his mother in part secured by the $80,000 of equity in her

14  home, coupled with a $70,000 cash 10 percent cash bond, your

15  Honor, with home confinement.

16        I should also mention, your Honor, that she's -- she

17  works in the immigration department.  She actually is -- she

18  works in the detention center as an officer.  And she has told

19  me under no circumstances will -- he'll be going anywhere, if

20  released on a bond.

21        He's a U.S. citizen, your Honor.  Right now he stands

22  having been convicted of nothing.

23        Yes, he has arrests.  There are two others that are

24  pending besides the parallel case in state court.

25        He's also -- he just turned 21, your Honor.  So I think

1   with a significant measure of supervision, he can -- he'll

2   clearly appear for any and all future court appearances.  He's

3   certainly not going to subject his mother's home to being

4   forfeited by anything that he would do.

5           And probably under the circumstances, Judge, based upon

6   his self-reporting of substance use and the prior possession of

7   marijuana in Huntsville, Alabama, I think probably some type of

8   substance abuse treatment while he's released would be

9   appropriate as well.

10          We think that with those circumstances, him being a

11  U.S. citizen, he does not have a passport that's valid in any

12  case; and but for one travel to Cape Verde islands at a very

13  young age, he has not left the country.  He's not going

14  anywhere.  He's a 21-year-old, your Honor.  He just does not

15  have the sophistication to be able to do that, your Honor.

16          THE COURT:  Okay.  Given the nature of the offense,

17  though, the evidence is sufficient for a clear and convincing

18  standard.

19          And had he not had a record, I might have considered a

20  bond.  But since he has -- he was out on bond on at least one

21  case, if not two, which I always -- I never award with another

22  bond in that situation.

23          I'll grant the Government's motion for detention based

24  upon not risk of flight as much as a danger to the community,

25  given his present history.

1        While you're in custody, though, Mr. Darosa, you'll

2   still have an opportunity to meet with your lawyer, meet with

3   your family and prepare for your defense of the case.  Okay?

4        Thank you very much.  So remember, we set this matter

5   for July 20th for the arraignment and report re: counsel.

6        MR. SCHUMACHER:  Yes, your Honor.  Thank you so much.

7        THE COURT:  Thank you.

8        (Proceedings concluded.)

9

10

11

12

13

14                    C E R T I F I C A T E

15

16        I hereby certify that the foregoing is an

17   accurate transcription of the proceedings in the

18   above-entitled matter to the best of my ability.

19

20   _____          /s/Lisa Edwards

21       DATE              LISA EDWARDS, RDR, CRR
                           Reporterlisaedwards@gmail.com
22                         (305) 439-7168

23

24

25